DECISION
In the matter plaintiff corporation is seeking to recover sums it claims it is owned for construction materials provided to the defendants. The case was tried before this Court without the intervention of a jury.
Plaintiff's first witness was Peter J. Alibrandi who was employed by plaintiff from April 1, 1994 to June of 1996 as its' regional credit manager. At the time Mr. Alibrandi assumed his position, the Laureanno account was already in arears in excess of $20,000. In an effort to discharge his new responsibilities Mr. Alibrandi set out to attempt to collect the debt. Initially, he tried contacting Mr. Laureanno by telephone but was never successful in reaching him. Mr. Laureanno failed to respond to the several messages Mr. Alibrandi left on defendant's office answering machine. On June 10, 1994 Mr. Alibrandi sent, by certified mail, a "Notice of Intention to Do Work or Furnish Material, or Both" to defendant corporation. Again, no response was forthcoming.
Plaintiff's next witness, Roy LeBlanc, served as Grossman's general credit manager from 1989 to August of 1996. Mr. LeBlanc testified that the defendants owned plaintiff $28,823.54 for goods, materials and supplies and that that sum represented a reasonable and standard charge in the industry at the time in question. In his estimation there was no indication whatsoever of over billing, or failure to properly credit defendants' account. Although the Grossman's retail stores subsequently closed, Mr. LeBlanc explained that the integrity of outstanding accounts was maintained as well as monitored by auditors.
In the early 1990's defendants' account was serviced by plaintiff's sales representative and account manager, Gregory Bettencourt. Mr. Bettencourt dealt personally with Mr. Laureanno describing him as a "tough guy to work for" but "no tougher than any other contractor." Mr. Bettencourt was the only witness who personally dealt with Mr. Laureanno on a routine basis. In fact, he was the only witness who had ever met the defendant.
Mr. Bettencourt was employed by Grossman's from 1986 to 1994 serving as an assistant manager, manager and road salesman. He had observed the defendant building houses and learned that the defendant had an open account at Grossman's. Mr. Bettencourt solicited the defendant's business and served as defendant's personal account manager from 1991 to March of 1994 when Grossman's closed down. When Mr. Bettencourt left the company he described it as having "tremendous problem" with "numerous accounts in disarray." He explained that accounts were being "poorly handled" and "credits were not being issued." Defendant's account was characterized as a "very good account which was never abnormally in arrears." Mr. Bettencourt personally quoted prices to Mr. Laureanno and kept those quotes, not in a computer, but in a desk drawer.
Mr. Bettencourt was in the habit of visiting the work sites of the contractors with whom he did business. If wrong materials were delivered he would send a truck to pick them up and return them to the branch. This was done usually by telephone and would not be documented in any memorandum. It was anticipated that the customer would then be credited for the goods on a subsequent invoice.
With regard to Mr. Laureanno, Mr. Bettencourt had a personal memory of requesting that his company issue a credit to defendant for window and door screens and parts. Mr. Bettencourt's review of the credit memoranda, however, revealed that this was never done. Exhibit 2A, a September, 1993 invoice, shows defendant's balance at $1,630.79. The October invoice, Exhibit 2B, has $1,910.03 worth of new charges represented the cost, with two exceptions, of Andersen D-25's which Mr. Bettencourt testified were "definitely screens, maybe a few grills." In reality defendant would already have been billed for these items because he purchased the windows and their accompanying parts by the van load at a reduced price. The screens and parts are simply not delivered to the work site where they could get damaged, lost, or stolen. A credit failed to issue to defendant for these "pre-billed" goods. The two exceptions in the invoice, which defendant agrees he owes, are $93.80 for five Schlage entrance boxes and $56.07 for 30 soffit vents. Thus, on this invoice defendant owes only the sum of $149.94 for a total balance of $1,780.73. November's invoice, Exhibit 2C, includes a charge of $2,150 for oak flooring which defendant returned to plaintiff because it was not "in keeping with what [plaintiff] usually sent him." Mr. Bettencourt personally arranged for a truck to pick up the lumber and return it to the store. Yet, defendant was never credited for that sum plus sales tax of $150.50 for a total of $2,300.50. Subtracting the latter sum from the total of $2,930.33 leaves a balance of $629.63 The remainder of the cost for legitimately invoiced items brings this sum up to $1,276.85. Subtracting a credit of %56.07 (Grossman's had over credited by $28.56) defendant's November subtotal is %1,220.58.
The very first entry on the December invoice for $3,534.06 is for a load of lumber which was erroneously deposited at defendant's work site. Mr. Bettencourt and Mr. Laureanno together physically loaded it back on the truck with the assistance of a forklift and backhoe so that it could be delivered to the correct customer. The remainder of the items in Exhibit 2D, the defendant agrees, are valid charges for goods furnished Subtracting the credit of $1,528.43 listed on the invoice leaves defendant's December subtotal at $2,219.89.
In January of 1994 defendant was again recharged for Andersen grilles and screens which were part of the original van load. As noted on the invoice the defendant also refused a shipment of lumber entitling him to a credit of $1018.84. The charges properly invoiced items minus the credit leaves the January subtotal at $1,892.02.
In February plaintiff failed to credit defendant for roofing shingles which defendant returned because there was an insufficient amount of shingles from the same dye lot. As Mr. Laureanno had a roofing team ready to go and was trying to make a house weather tight, Mr. Bettencourt advised him to go to another supplier as plaintiff could not provide the goods. Mr. Bettencourt explained that things at Grossman's were "getting worse by the day" due to the imminent closing of the business and the departure of employees to new jobs. This invoice also charges defendant full list price for items for which he was entitled to, and had historically been given, a contractor's reduced price. Mr. Bettencourt specifically recalls a telephone call from Mr. Laurenno complaining about this, causing Mr. Bettencourt to inform his company that a credit must be given. As on previous occasions defendant was rebilled for window parts. The correct balance for February according to Mr. Bettencourt's credible testimony and the documentary evidence is $7, 123.76.
During the last month of business, March 1994, defendant was properly invoiced for $3, 195.19. With a credit to him for $6,178.24, the March balance was in the negative at $2,983.05. the total de was $11,254.13. Although Mr. Bettencourt had left plaintiff's employ he continued to receive calls from the company's attorney who asked for his opinion on the status of numerous accounts, including Mr. Laurenno's. On May 25, 1994 defendant gave plaintiff a check for $6,586.74. In July, after the lein notice was transmitted, either Mr. Darling (plaintiff's attorney) or Mr. LeBlanc called Mr. Laureanno regarding his account. Mr. Laurenno called Mr. Bettencourt to ask his opinion regarding settling his account for $4,000. Mr. Bettencourt advised Mr. Laureanno to finalize the bill for that amount and the company accepted it in a check dated July 14, 1994. This is in direct contradiction to the testimony by plaintiff's representatives at trial who testified that even after the lien notice Mr. Laureanno never contacted the company.
It is clear from the evidence that Gregory Bettencourt has superior knowledge, indeed the only personal knowledge, of the events in controversy. His memory appears to be excellent, and he was most candid. His patience in methodically explaining the invoices and undergoing a very lengthy examination was extraordinary. While his company was plunging into a confusing state of disarray, he was the individual who was actually dealing with customers face to face and trying to insure they got what they paid for. Despite his best efforts he was unsuccessful in processing the majority of credits because "[you] could talk to one person in the office at one moment and the next day that person wouldn't be there. Then you start all over again the next month when you realized that credit had not been issued."
At the conclusion of the business relationship between plaintiff and defendant, according to both the testimonial and documentary evidence, defendant's balance was $11,254.13. Credits for the two aforementioned checks reduced the sum to $667.39. Judgment shall enter for plaintiff in that sum.